NADINE HAYS
370 Highland Hills Drive
Camarillo, CA 93010
(805) 484-4452
(818) 474-7676 – Fax
NadineHays@aol.com
In Pro Se

# UNITED STATES DISTRICT COURT,

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Nadine Hays, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>City of New York ("NYC"),<br>Officer Dennis Byrnes ("BYRNES"),<br>Officer Kino Cox ("COX"),<br>Captain Mark Iocco ("IOCCO"),<br>James Conroy, ("CONROY"),<br>Officer Eric Grimes ("GRIMES"),<br>Detective Rick Lee ("LEE"),<br>Michael Bloomberg ("BLOOMBERG").<br>Raymond Kelly ("KELLY"),<br>DOES 1-10<br><br><br>Defendants | Case No.<br>Assigned for all purposes to:<br>Judge:<br>Dept: Currently Courtroom<br><br>**FIRST AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Original Complaint Filed: 12/16/14<br>Trial Date: None<br>Discovery Cut Off: None |

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE

1                                                            5/26/16

**FIRST AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

1. My name is Nadine Hays and I am the Plaintiff in this case.  I live in Camarillo, CA.

2. This is a civil rights action brought to vindicate my rights under the First, Fourth, Eighth, and Fourteenth Amendments of the Constitution of the United States, as well as my rights protected by the Privacy Act and Americans With Disability Act, through the Civil Rights Act of 1871, as amended, codified as 42 U.S.C. § 1983, and with pendant claims under the Constitution and laws of the State of New York.

3. My rights were violated on September 17 and 18, 2013 when officers from the NEW YORK POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis used gratuitous, unlawful force against me. By reason of Defendants' actions, including their unreasonable use of force, I was deprived of my constitutional and common law rights.

4. I seek monetary damages and such other relief, including injunctive relief and declaratory relief [if appropriate], as may be in the interest of justice and as may be required to assure that the I secure full and complete relief and justice for the violation of my rights.

## JURISDICTION

5. Jurisdiction of this Court is invoked pursuant to and under 28 U.S.C. Sections 1331 and 1343 in conjunction with the Civil Rights Act of 1871.  This action is brought pursuant to 42 U.S.C. Sections 1983, 1985, 1987 and 1988, and the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

6. I also invoke the jurisdiction of this Court in conjunction with the Declaratory Judgment Act, 28 U.S.C. Sections 2201, et seq., this being an action in which I seek, in addition to monetary damages, whatever other relief is needed to provide full and complete justice including, if appropriate, declaratory and injunctive relief.

7. This Court has supplemental jurisdiction over my claims against Defendants under the Constitution and laws of the State of New York because they are so related to the federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper pursuant to 28 U.S.C. § 1391 in that my claims arose in the Southern District of New York.

---

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

2                                            5/26/16

**FIRST AMENDED COMPLAINT**

**THE PARTIES**

9. I, Nadine Hays, Plaintiff in this case, am a citizen of the United States. I am a resident in the State of California, the City of Camarillo, and the County of Ventura.

10. Defendant City of New York is a municipal entity which was created under the authority of the laws and Constitution of the state of New York and which is authorized with, among other powers, the power to maintain a Police Department for the purpose of protecting the welfare of those who reside in the City of New York. Defendant City of New York ("CITY") assumes the risks incidental to the maintenance of a police force and the employment of police officers.

11. Defendant Michael Bloomberg ("BLOOMBERG") was the mayor of the City of New York at the time of my arrest. Defendant Raymond Kelly ("KELLY") was the Police Commissioner for the New York Police Department ("NYPD"). Both of these individuals were responsible, in whole or in part, for the creation, implementation, promulgation, and enforcement of the policies, practices, and/customs complained of herein. They are sued in their individual and official capacities.

12. Defendants Officer Dennis Byrnes ("BYRNES"), Shield #25055; Officer Kino Cox ("COX"), Tax Registration Number 938280; Officer Eric Grimes (GRIMES"), Shield #02342 Tax Registration Number 933820; James Conroy ("CONROY"), Agency Attorney for the NYPS Legal Bureau; Captain Mark Iocco ("IOCCO"), Tax Registration Number: 917770; Detective Richard Lee ("LEE"), Shield #4838, Tax Registration Number 9076555; are/were New York City Police Department officers and/or agents and all are/were employees of the City of New York on September 17-18, 2013 and September 17-18, 2014.

13. Although the Defendants' actions and conduct herein described were unlawful and wrongful and otherwise violated my rights as guaranteed under the laws and Constitution of the United States, they were taken in and during the course of their duties and functions as New York City Police Department officers and/or agents. They were employees of the City of New York and incidental to the otherwise lawful performance of their duties and functions as New York City Police Officers and agents and employees of the City of New York. All Defendants are sued in their individual and official capacities.

14. Agents BYRNES, COX, GRIMES, CONROY, and IOCCO were directly involved in my unlawful arrest in the afternoon on September 17, 2013 next to Zuccotti Park. They caused me to be unlawfully assaulted, battered, seized, and incarcerated when I was speaking to the public by Zuccotti Park on September 17, 2013. Although my alleged criminal act was using amplified sound without a permit (which is not an arrest offense),

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

1
2
3
4

it is my belief that I was targeted because of my political affiliation with individuals that participated in the Occupy Wall Street movement. One of my passions has been with "outreach" or education in order to inform Americans about what our country is really all about. It is my belief that if we can wake up enough American citizens, we might have a chance to regain the democracy we were supposed to have but that has been stolen from us by greedy, money- hungry corporations and banksters.

5
6
7
8
9
10

15. Detective Richard Lee ("LEE") was the individual I was working with at the First Precinct in order to obtain an amplified sound permit for September 17, 2014. I was told that the permit had been granted and that I merely needed to swing by the First Precinct in order to pick it up. When I arrived at the First Precinct on September 17, 2014 to pick up the permit, LEE was not there and nobody could help me. I then went down to Zuccotti Park, where I found LEE. He informed me at that time that my permit had not been granted. LEE kept a watchful eye on me; I truly felt like he was a stalker just waiting for me to make a wrong move. I was so grateful when I finally safely returned to California.

11
12
13
14
15
16
17
18
19

16. Michael Bloomberg ("BLOOMBERG") was the mayor at the time of my arrest. He was also the mayor at the time the encampment in Zuccotti Park was dismantled (November 15, 2011). There has been a lot of politically motivated suppression of the people's voice which became very strong from the time the encampments throughout the United States were taken down. People have been prosecuted for telling the truth even though there is allegedly legislation in place to protect whistleblowers. BLOOMBERG and KELLY could have been diplomatic in the way the protesters were dealt with, but instead, they approved of and endorsed the many violent custodial arrests that were done to peaceful activists that were merely exercising their rights to speak out regarding their concerns (mostly politically related). Sometimes individuals were just randomly picked out of a crowd and arrested. These individuals were either incarcerated in the jails or placed in the custody of mental institutions like Bellevue Hospital. This was indeed an abuse of power and individuals involved in such heinous crimes should be held accountable for injuries they have inflicted on innocent citizens.

20
21
22
23
24
25

17. At all times relevant herein, the individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of the CITY. The true names and shield numbers of Defendants DOE 1 through DOE 10 are not currently known to me. However, all of said Defendants are employees or agents of the CITY. Accordingly, said Defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to N.Y. G.O.L. § *50-E*. The Law Department, then, is hereby put on notice (a) that I intend to name said officers as Defendants in an amended pleading

26
27
28

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

4                                          5/26/16
**FIRST AMENDED COMPLAINT**

1    once their true names and shield numbers become known to me and (b) that the Law
     Department should immediately begin preparing their defense in this action.

18. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with
    malice and gross disregard for my rights.

19. At all relevant times, the Defendants were engaged in a joint venture, assisting each other
    in performing the various actions described herein and lending their physical presence
    and support and the authority of their offices to one another. By hiding under the shield
    of the government uniforms and titles, Defendants were able to perform criminal acts
    without suffering any of the consequences. Defendants actually found joy in making life
    miserable for others, a way of thinking that would be defined as being psychopathic by
    mental health professionals. This type of individual should not be allowed to serve in a
    position where they are supposed to do the will of the people.

## NOTICES OF CLAIM

20. Pursuant to New York State General Obligations Law § *50-G* , on October 30, 2013, and
    within 90 days of the accrual of my causes of action herein, I served on the Comptroller
    of the City of New York a Notice of Claim (see **Exhibit 1)** setting forth the time when,
    the place where, and the manner in which, my claims arose.

21. More than 30 days have elapsed since my Notice of Claim was served upon Defendant
    the City of New York and said Defendant City has neglected and/or refused to make an
    adjustment or payment.

## DAMAGES

22. As an actual and proximate result of the actions of the named Defendants, especially the
    excessive use of force by assaulting and battering me without warrant or probable cause,
    and the unlawful search and seizure of my person and my property, I have incurred
    substantial personal expenses, suffered humiliation, mental anguish, nervous distress,
    sleeplessness, and disruption to my relationship with my family and husband. I have
    been unable to continue with my normal daily functions due to my thought processes
    being compromised due to the Post Traumatic Stress Disorder, which is a permanent
    brain injury, also known as a TBI (Traumatic Brain Injury). This is not an emotional
    injury. It is a physical injury to the brain; see **Exhibit 2,** p. 1, *.  An intake specialist at
    my medical provider (Kaiser Permanente) diagnosed me with PTSD; see **Exhibit 3.** My
    current psychiatrist has diagnosed me with "chronic PTSD" (see **Exhibit 4)** which means

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

the effects cannot simply be cured by counseling or medication. I basically have had to learn to adapt the best I can to this life-long injury or disability. Finally, our family income decreased and we incurred medical and other health care expenses due to the stresses that were added to our family relationships.

23. I have not been able to function as I used to as a mother, a grandmother, and a wife due to the stress I have had to endure since my arrest in New York City. I have had medical bills, travel expenses to retrieve my property, repair expense to fix my damaged speaker, and life-long disabilities that I will have to endure due to the actions of Defendants in this case.

24. My family members have likewise suffered, primarily due to the loss of their loved one, myself, in their lives and the extra burdens put on them because of me no longer being able to do the things I used to do as their wife, mother, and grandmother.

25. My family has had great difficulty adapting to the "new normal" as the psychologists have termed it…a change that needs to be accepted and not expected to ever go back to "the way things used to be".

## FACTS

26. This litigation arises out of the my brutal custodial arrest on Tuesday, September 17, 2013 at around 3 pm on the corner of Liberty and Broadway by Zuccotti Park in the City of New York.

27. Since I had become an educational political activist in 2011, I had educational materials with me when I arrived in New York City on September 17, 2013. In my car I had a dolly to carry my supplies, some of which included but was not limited to a portable amplified speaker and microphone, a plasma screen monitor, a deep cycle battery, an inverter, and my computer with all of my educational programing.

28. When I entered New York City on the morning of September 17, 2013, I could not believe the large presence of police officers, vans, cars, and even buses. This was definitely a means to intimidate those who had decided to come into New York City to celebrate the two year anniversary of Occupy Wall Street. The activists were entertaining and peaceful, yet the large presence of law enforcement officers stifled the spirit of the day. Such harassment was indeed their intention and was indeed an abuse of process.

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

**FIRST AMENDED COMPLAINT**

29. After parking my car in a parking garage on Murray Street, I began my journey to Zuccotti Park.

30. When I arrived at Zuccotti Park, I began my presentation. People in the area gathered to listen to what I had to share with them.

31. I was then approached by Captain Mark Iocco ("IOCCO"), who asked me if I had a permit for the amplified sound. My response was, "Yes...it's called the First Amendment to the U.S. Constitution."

32. James Conroy ("CONROY"), part of the NYPD Legal Bureau, was also present. He had the word "LEGAL" written on the back of his jacket. I was not interfering with the flow of the pedestrian traffic and I had the attention of various individuals in the area that wanted to hear what I was saying. I was never asked to move. If I had been, I would have, as that is precisely why everything I had was on wheels. My mild amplification was medically necessary for me, as I have had issues in the past with getting laryngitis from speaking all day without assistance. My doctor even recommended that I use mild amplification; see **Exhibit 5**.

33. I tried desperately to communicate with IOCCO and CONROY and they refused to talk to me. I had case law with me that showed that amplified speech or music is considered protected by the First Amendment as long as it is not so loud as to be causing a disturbance of the peace; see **Exhibit 6**, p. 2, *. I also had case law which stated that it was unconstitutional to require a permit for a single speaker with no organized audience in a public arena; see **Exhibit 7**, p. 1, * - p. 2, *.

34. If IOCCO and CONROY had at least listened to me we might have been able to prevent the scene from escalating. Because IOCCO and CONROY refused to listen to me, they were negligent and the incident escalated to a very hostile custodial arrest. GRIMES stood by and videotaped the incident. He witnessed the abuse and yet failed to intercede in my behalf. Because of the negligence of BYRNES, COX, IOCCO, CONROY, and GRIMES, my rights were violated and I was harmed.

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

7                                                       5/26/16
**FIRST AMENDED COMPLAINT**

35. IOCCO and CONROY were actively involved in the orchestration of my arrest through their continual communications with one another and with others via their communication devices.  I have a video of my arrest that was taken by a fellow activist.[1]

36. The unknown individuals involved in the conversations are currently referred to as DOES.  This complaint will be amended after discovery when their identity has been made known.  There is no doubt in my mind that I was not arrested for my amplified sound, but rather I was arrested because I was an educator, had people interested in what I was talking about, and that the topic I had chosen to talk about was a threat to those that were involved in the false flag attack on September 11, 2001 when the World Trade Center towers and Building 7 were taken down.

37. This conspiracy to take me out of commission was actively encouraged, and thereby participated in, by BYRNES, COX, GRIMES, CONROY and IOCCO, as well as the currently unknown DOE defendants.

38. It became apparent that the officers were preparing to arrest me and there was nothing that I could do to stop them.  Although there were plenty of officers within 50 feet of where I stood, IOCCO had waited until Officer Dennis Byrnes ("BYRNES") and Officer Kino Cox ("COX") from the Bronx Task Force arrived.  It should be noted that the Bronx Task Force has been renamed Strategic Response Unit 2. This is a new grouping of officers that are heavily armed and given the task of combating terrorism, which, according to Commissioner William J. Bratton deals with events like "protests or incidents like Mumbai or what just happened in Paris."; see **Exhibit 8**, p. 1, *.  Activists are now being denied their right to speak out as they are now being placed in the same classification as terrorists.  If the American people are going to survive, it is now obvious that we are going to need to rely on the courts to call out the government on this hellacious abuse of power and process.  The individuals making these new "rules and regulations" need to be placed behind bars for treason against the American people.

39. Because of the way my arrest was handled I know that I was unlawfully and discriminatorily arrested because of my affiliation with the Occupy Wall Street Movement. Enough evidence has been produced to show that there was a covert federal government conspiracy to silence the Occupy movement; see **Exhibits 9 and 10.** A document produced through a Freedom of Information Act (FOIA) request indicates that there was a federal government plot to assassinate leadership in the Occupy movement by way of suppressed sniper rifles; see **Exhibit 11**, p. 2, *  This certainly is a violation of one's right to life, liberty and the pursuit of happiness without due process of law.

---

[1] For video please see the following link:  https://www.youtube.com/watch?v=olJ-plcFnfk

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

8                              5/26/16
**FIRST AMENDED COMPLAINT**

40. Suddenly the officers in the area surrounded me. They issued threats to the bystanders to not interfere or they will also be subject to arrest. I was handcuffed with heavy-duty plastic zip-lock ties behind my back, I was pulled backwards by the zip-lock ties, and finally lifted, once again by the zip-lock ties, into the awaiting paddy wagon. The force of the zip-lock ties cut into my very arthritic wrists and caused me such excruciating pain that I screamed and began to cry uncontrollably. My pleas for help were completely ignored. In fact, the more I cried the crueler the officers became. BYRNES, COX, IOCCO, CONVOY, and GRIMES were all present and witnessed my unlawful arrest when I was physically taken into custody.

41. There was no lawful basis to seize and arrest me. These individuals were not hired to harass and intimidate peaceful activists. Their use of such brutal force on me was indeed an abuse of power.

42. At the time I was a 61 year old grandmother of 9. I was physically disabled. In 2009 I had a complete left knee replacement and in August, 2014 I had a complete right hip replacement. I have severe arthritis in my hands and wrists, so the mere act of handcuffing me and dragging me backwards caused excruciating pain and made me scream in agony.

43. All of my property was confiscated by the police; this was done without my permission and against my will. The items taken and not returned to me included all of my cash (some of which included some irreplaceable bills), my cell phone, my Garmin GPS system, my plasma screen TV, a car battery, an AC inverter, a powered speaker, a microphone, a computer, a projector, a hand truck, papers, cords and wires for the electronics, an American flag, and various bags.

44. I was placed on a painted bench in the paddy wagon with no seatbelt protection. Defendants COX and BYRNES rode in the front cab of the wagon. Defendant COX, the driver of the vehicle, drove very erratically, so I was fearful of falling off the bench or hitting my head on the wall of the truck. I asked Defendant COX to slow down and to drive more carefully, but the driving became even worse. Every time my body was jerked from side to side my body and joints ached with pain because of my arthritis.

45. I was first taken to the Seventh Precinct. I was walked into an open air courtyard and finally was taken into the building. An officer removed the zip-lock handcuffs and I was placed in a cell by myself. After an hour or two I was placed back into the paddy wagon by Defendant BYRNES, the arresting officer, and I was transported to the Manhattan Detention Complex. Not once did I hear an officer say I was arrested because I had amplified sound without a permit. I did hear repeatedly "She's with Occupy." I was

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

9                                          5/26/16
**FIRST AMENDED COMPLAINT**

being discriminated against because of my political affiliation, a protected class of people!

46. While I was at the Manhattan Detention Complex my picture and fingerprints were taken without my permission. I felt that my privacy had been violated by officers that have been hired to protect and defend me from criminals. In this case the officers themselves were indeed the criminals, guilty not only of gang-like scare tactics that were very intimidating, but their actions matched the description for disorderly conduct. The officers themselves had engaged in disruptive conduct (my unwarranted arrest) with the intent of impeding and disrupting the orderly conduct of a lawful public gathering.

47. BYRNES took me to the District Attorney's office. BYRNES went in to talk with a representative while I was watched in the waiting room. I later found out the reason for our visit was so that the District Attorney could determine what the charges against me were going to be; see **Exhibit 12**. It should be noted that at the time of my arrest I was *not* told why they were arresting me. I was charged with:

   a. AC 10.108, a sound ordinance violation for operating a sound production device in a public area, which was not an arrest charge;
   b. PL 240.20 05 Refusing to move which was not an arrest charge; and
   c. PL195.05, a misdemeanor and arrest charge for an obstruction of governmental administration.

48. Although the CITY has placed an argument with this Court that there was probable cause for my arrest, when one looks at the totality of the circumstances there was no probable cause. First of all, the amplified sound permit violation was not an arrest offense; see **Exhibit 12.** Secondly, the purpose of the amplified sound ordinance is to protect the public from any loud sounds that are "detrimental to the health, welfare, and safety of the inhabitants of the city, in that such use or operation diverts the attention of pedestrians and vehicle operators in the public streets, parks and places, thus increasing traffic hazards and causing injury to life and limb. It is hereby declared as a matter of legislative determination that the prohibition of such use or operation for commercial or business advertising purposes and the proper regulation of such use and operation for all other purposes is essential to protect the health, welfare and safety of the inhabitants of the city, to secure the health, safety, comfort, convenience, and peaceful enjoyment by the people of their rights to use the public streets, parks and places for street, park and other public purposes and to secure the peace, quiet and comfort of the city's inhabitants."

49. This point is clearly supported by what I was doing. I am concerned about the health, safety, and welfare of my fellow Americans and that is why I was bearing my testimony to the people around me that 9-11 was indeed an inside job. 9-11 was done to justify the U.S. invasion into foreign countries in search of weapons of mass destruction that our

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

10                                    5/26/16
**FIRST AMENDED COMPLAINT**

government knew did not exist. By doing so, our foreign affairs policies have been creating enemies against us as we kill thousands of citizens in their native countries.

50. The permit fee is allegedly justified "to delay the expenses of regulating such use or operation for the health, welfare and safety of all people". This might be justification when there is a huge crowd that needs to be controlled but in my situation I only had about 20 people listening to me. There is case law that says requiring a permit for a single speaker is unconstitutional. In *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) the 9th Circuit held that a designated-performance-space and permitting system established by the City of Seattle for the Seattle Center was facially unconstitutional under the First Amendment; see **Exhibit 13, \*.**

51. Finally, when the government is given the discretionary power of who is going to be allowed to have a permit, the likelihood of discriminatory enforcement of the law greatly increases. In fact, this is precisely what occurred the next year when LEE initially told me that I had been granted the permit and then when I arrived in New York City I was told that my request for a permit had been denied. This was in direct violation of the law; see **Exhibit 14**, p. 2, \*.

52. The officers should have first told me what law I was violating. I have traveled all over the United States, including Washington, D.C.; Chicago, IL; Tampa, FL; Ft. Mead, MD; Charlotte, N.C.; Philadelphia, PA; Kalamazoo, MI; San Diego, CA; Sacrament, CA and San Francisco, CA and I have *never* been abused by the police like I was in New York City.

53. I tried to get the officers to talk with me and they intentionally ignored my attempts to reach a mutually acceptable agreement regarding how we were going to proceed. It was much easier for them to simply toss me in jail and be done with me. Their attitude was hostile, cruel and ruthless. It was very obvious to me that they had no training regarding how such treatment can damage an individual (or, perhaps they did know and that's precisely why they did what they did to me). This was cruel and unusual punishment, something I am protected against by the Eighth Amendment to the U.S. Constitution.

54. Since Defendant BYRNES was from the Bronx area, he was not very familiar with the Courthouse we went into. We moved around to different locations. I was fearful when going down the metal stairs, as my hands were cuffed behind my back and there was nothing to catch me if I were to lose my footing. It was hard for me to believe that this is standard protocol when moving a prisoner around. It certainly would have been much safer for me to be handcuffed to Defendant BYRNES with one hand, or to have one hand cuffed behind my back and attached to my elbow area of the other arm so I could have one hand free to hold the handrail. Prisoner safety is obviously not a priority with the NYPD.

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

5/26/16
**FIRST AMENDED COMPLAINT**

55. I was then taken to the courtroom by BYRNES.  We had not been in the Courtroom long before BYRNES told me to get up.  We then proceeded to walk outside.  I was then placed back into the paddy wagon.

56. The vehicle finally stopped in front of Bellevue Hospital ("Bellevue").

57. As we walked into Bellevue Hospital I was shocked at the large number of officers and restrained criminals there. I had my vitals taken.  My blood pressure was about 145/91 which was very high for me.  Since I tried to be as active as possible, my normal blood pressure had been around 120/65.

58. I was then taken to the psych ward where I was made to wait for hours.  I wore contact lenses and needed to remove them from my eyes so my eyes would not get irritated, turn red, and sting.  I asked for some containers of water so I could take them out.  BYRNES brought me one small cup of water.  When I asked for a second one he refused to assist.  I finally made due with a tissue I had in my pocket and a piece of saran that had been on a cheese sandwich.

59. I had heard horror stories about what had happened to activists in the psych ward at Bellevue.  Julian Heinklen, a retired science teacher from a local university, had allegedly been tortured there; his passion was jury nullification.  He was arrested for protesting on federal property.  When he was finally released, he flew to Israel, was granted instant citizenship at customs, and has never returned to the United States.

60. I did not feel safe at Bellevue and I wanted to leave as soon as possible.  I spoke with another prisoner in the waiting room.  I asked him where he would go if he had his choice of hospitals in the area.  He told me Lenox Hill.  I then told BYRNES that I wanted to be taken to Lenox Hill Hospital.  I told BYRNES that I would pay for the transportation and for the medical evaluation.  BYRNES ignored my requests.

61. I lost track of the time, but we were probably at Bellevue for at least 8-10 hours.  I finally interviewed by the professionals and released.  (I was prepared for a very defamatory report to be written which would support the officers and demonize me.  Eventually I did receive the report, which was exactly as I had expected.)  I was told by one of the professionals that she would call my husband and let him know I was OK.  That call never materialized.

62. I was then placed back into a vehicle and taken back to the Courthouse.  While I was in the hallway BYRNES informed me that we needed to take some more pictures.

---

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

5/26/16
**FIRST AMENDED COMPLAINT**

63. I was then taken to a room where an officer asked me to take off my earrings. BYRNES uncuffed me so I could do so. When the right side photo was being taken, I finally realized that there was a difference in the type of photography equipment being used. I asked the officer if they were doing biometrics. The DOE officer that was taking the photographs confirmed that they were. I told them that I did not give them permission to do so. The officer's reply was that if I did not cooperate that I would not leave the facility. With that threat, I finally gave in because I knew that psychologically I would not last much longer.

64. The officer taking the pictures then picked up a hand-held device and started to approach my face with it. I immediately knew that what he held was an iris scanner. Infuriated at the violation of my privacy, I exclaimed: "Absolutely not. What to do want me to do…spread my legs and let you do it to me?" The young male officer got the message and backed off.

65. BYRNES was suddenly triggered. He slapped a handcuff on my left wrist and threw me up against the wall. I was fearful for my life. My bladder completely emptied all over me. Defendant BYRNES threw the other cuff on my right wrist, once again with both hands being behind my back.

66. BYRNES then began dragging me backwards down the hall. I not only feared for my life, but was also in excruciating pain due to the pressure of the handcuffs on my arthritic wrists. I was drug backwards through a court in open session, screaming in pain and crying as I was so distraught at what was happening to me. The judge in the courtroom, later discovered to be Judge Johnson, did nothing.

67. I was then taken into another courtroom where I waited for my name to be called. The District Attorney offered "time served" as a plea bargain; I did not accept.

68. Even though I had been given the impression that I had been arrested for the amplified sound without a sound permit, I later discovered that this was not an arrest offense.

69. Jonathan Stonbely from the Legal Aid Society assisted me in front of the judge. I was pre-arraigned and my next appearance date was set for October 30, 2013. I was released with no bail being charged. The only thing I was given before leaving the courtroom was a property receipt, which did not have a complete listing of all of my property that had been taken.

70. As I was leaving the courtroom I noticed BYRNES rush out the door. No offer was made to help me get my possessions back or to give me a ride back to the First Precinct so I could get my money and ID. Jonathan Stonbely, feeling sorry that I had been left stranded at the courthouse with no transportation, was kind enough to get me a 1 trip subway ticket but I had no idea where the subway even was. That ticket did not get used.

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

5/26/16
**FIRST AMENDED COMPLAINT**

71. I had been left in a courthouse, drenched in urine, with no ID and no money. My mind was totally scrambled because of the excessive force that had been used against me. I could not even think about what to do next. I crumbled to the ground and cried uncontrollably for what seemed to be eternity.

72. Eventually I calmed down. I was finally able to control my emotions. I decided to try to locate my ID and money. After much inquiry I decided that my property was probably at the 1st Precinct. I asked for directions and then began my journey by foot.

73. I finally located the 1st Precinct. An officer took my receipt and, after a short wait, brought me a piece of cardboard to which all of my credit cards, as well as my driver's license, had been taped. All of my money was gone, however, including some irreplaceable bills.

74. The woman that gave me my credit cards and driver's license had printed up some additional property receipts; see **Exhibit 15**. The receipts were not accurate. Some items were not even listed on the receipts; see **Exhibit 16**. Those items that were listed on the receipts were scattered in warehouses throughout the city; see **Exhibit 17**.

75. I walked back to the courthouse. I tried to make a few phone calls on my credit cards, but after a few calls the cards were declined. I later found out the reason my credit cards would not work was because I was out of my "standard" area of purchasing, namely California, and their identity theft department had put a hold on my accounts.

76. I went down to the local Chase Bank and, using the ATM machine I was able to get $200 in 20 dollar bills from my account. When I returned to the courthouse I could not find anyone that could give me change so I could use the pay phones. Once again I crumbled on the outside stairs to the courthouse and cried.

77. After regaining my composure I was finally able to get some change from some women that were passing by the courthouse. I went into the courthouse once again and called my husband, who told me to call the National Lawyer's Guild ("NLG"). My husband provided me with their phone number.

78. I called the NLG and Susan Howard ("HOWARD") answered the phone. Although she was very kind and comforting to me, I once again broke down in tears. Before I finished my conversation with HOWARD, 3 volunteers from the NLG arrived at the courthouse, calmed me down, and let me use their cell phone so I could call my husband. They then were able to direct me to the location where I had parked my car.

79. It took me approximately 3 ½ hours to get to my hotel, which was only 35 minutes away from New York City. I was forced to stop many times to get directions, as I had no map

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

and no GPS service (everything had been confiscated by the police); psychologically I was completely disoriented. My ability to feel oriented when I travel has been completely destroyed since this incident.

80. The next day I attempted to retrieve my property. Since it had all been labeled "arrest evidence", the police refused to give it back to me. Consequently I was forced to leave NYC without my property. A separate trip to NYC was required in order for me to finally get back my property, some of which had been damaged during the confiscation process.

81. Even though I specifically told the officers that they did not have my permission to take my property, they took everything and labeled most of it as arrest evidence even though none of it was arrest evidence. When I returned home I was forced to purchase a new computer, cell phone, amplified speaker, and microphone so that I could try to resume my daily activities. Unfortunately my ability to resume what I used to do had been severely marginalized by the trauma I had endured from officers working for the NYPD. I have been told by my doctors that what I am currently suffering from is something I need to learn to deal with and that it is not going to go away. This includes short term memory loss, tangential thoughts, panic attacks when I see officers and/or when activity around me becomes stressful.

82. I made plans to return to New York City to retrieve my belongings a month later. I was told that they would release all of my items before I left on the trip but when I arrived in New York City the warehouses were not accessible. I had to return to New York City at the end of the week and I finally was given the majority of my property which included my cell phone, my Garmin GPS, a plasma screen TV, a car battery, an AC power inverter, a powered portable speaker, a microphone, my computer, a projector, a hand truck, my personal papers, cords and wires for the electronic equipment, and baggage for containing my supplies. My portable keyboard was lost and was never found. An audio cable connector was broken off in my speaker due to the carelessness of whoever handled my property. I eventually had to send it into the manufacturer in order to have it repaired.

83. My NYPD criminal case was dismissed on April 29, 2014.

84. I have been under the care of counselors and doctors ever since this incident occurred for the physical and psychological damages that have been done to me.

85. The City of New York and the NYPD maintains a policy or custom that permits amplified sound from those that they choose to give said right. In NYC the right to talk with mild amplification will cost an individual at least $45, but only if the police wish to grant a permit to the applicant. This policy is highly discriminatory and is

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

1    unconstitutional; discretionary enforcement of the law is a violation of due process under
     the 14th Amendment to the United States Constitution.

2
86. I was once again discriminated against on September 17, 2014 when the police refused to
3       give me an amplification permit even though I made application for said permit 1 month
        in advance; see **Exhibit 18**. This was for the Occupy Wall Street 3 year anniversary
4       gathering.  Originally I was told by LEE that I had been granted the permit but when I
        went to the precinct to pick it up I was told it had been denied.
5

6   87. The NYPD acted as agents of the state as they discriminated against me and suppressed
        my right to free speech expression.
7

8   88. My arrest on September 17, 2013 in front of all of the people at Zuccotti Park was
        humiliating,  embarrassing, very stressful and anxiety inducing.
9
    89. My arrest and the pendency of the criminal court proceeding, until it was dismissed, were
10      stress and anxiety inducing, emotionally distressful, and otherwise publicly humiliating
        and embarrassing.
11

12  90. Defendants BYRNES, COX, GRIMES, CONROY, and IOCCO worked in a concerted
        effort to see my arrest occur.  They were indeed co-conspirators in my unlawful arrest.
13      Each and every one of the officers were involved in the pre-planning and/or the execution
        of my arrest.
14

15  91. It is believed that, among the Defendants, all or some had had specialized training in how
        to deal with individuals involved in the Occupy movement.  I believe that the orders to
16      suppress the dissent came not only from the mayor of the city, but from individuals of
        authority from within the Department of Homeland Security.
17

18  92. It is believed that the Defendants lacked an objectively reasonable probable cause fact
        basis on which to believe that I was engaged in any criminal conduct on September 17,
19      2013 to justify my custodial arrest.

20  93. I committed no criminal offense or other offense whatsoever and no reasonable police
        officer could have reasonably and objectively believed that I committed any criminal
21      offense or any other offense under the law to justify even a stop, let alone a custodial
        arrest, incarceration and detention.
22

23  94. There was no basis for the stop and custodial arrest of myself  by the New York City
        Police Officers, each of whom is an agent and employee of the City of New York.
24
    95. Throughout my entire time with Officer BYRNES, the comment I heard over and over
25      again from the officers were "she's with Occupy."

26

27  **COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

28                           16                              5/26/16
                    **FIRST AMENDED COMPLAINT**

96. There was no justification to handcuff me or to detain me in custody for approximately 24 hours.  After appearing before the Court, I was released without bail and required to return to court on October 30, 2013. The charges against me were eventually dismissed and the records sealed.

97. The Defendants, per the policy of the City of New York, silenced and intimidated another Occupier trying to "wake up the sleeping giant".

98. While the actions and conduct of the New York City Police Officers were unlawful, they were taken in the course of their duties and functions and incidental to the otherwise lawful performance of those duties and functions as New York Police Officers and as agents and employees of the city of New York.

99. My custodial arrest was unlawful and thereby violated my rights protected by the First, Fourth, Eighth and Fourteenth Amendment to the Constitution of the United States.

100.     I was subjected to a Fourth Amendment offensive stop, false arrest and unlawful custodial detention and imprisonment, and I was subjected to excessive, unreasonable and unnecessary force in the form of my hand cuffing, being pulled about backwards by the handcuffs, thrown against a wall, and being left helpless and alone, saturated in urine, after appearing before the judge.

101.     The actions, conduct, policies and practices and customs here and described violated the my rights as guaranteed under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, and 42 U.S.C. §1983.

102.     I suffered injuries and damages including loss of liberty, fear, anxiety, mental distress, emotional anguish, and psychological trauma, PTSD (a permanent brain injury), and physical pain and suffering.

103.     I suffered public humiliation, embarrassment, and a loss of enjoyment of life.

104.     I have not yet placed a monetary value on the damages which I incurred although I believe them to be substantial and to include compensatory and punitive damages.

105.     I have no other adequate remedy of law other than for the institution of this litigation.

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS; NEGLIGENCE**

**FIRST AMENDED COMPLAINT**